## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| RICHARD D. KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:23-cv-725–HEH |
| | ) | |
| ALTRIA CLIENT SERVICES, LLC, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION
**(Resolving Motions for Summary Judgment)**

THIS MATTER is before the Court on three (3) cross motions for summary judgment, Plaintiff Richard D. Kelly's ("Plaintiff") Motion for Summary Judgment ("Pl.'s Mot. for Summ. J.," ECF No. 91); Defendant Altria Client Services, LLC ("Altria") and Deferred Profit-Sharing Plan for Salaried Employees' ("DPS") (collectively, "Altria Defendants") Motion for Summary Judgment ("Altria Mot. for Summ. J., ECF No. 81); and Defendant Fidelity Workplace Services, LLC's ("Fidelity") (collectively, "Defendants") Motion for Summary Judgment ("Fidelity Mot. for Summ. J.," ECF No. 87), all filed on November 11, 2024.

The parties have filed memoranda supporting their respective positions, and the Court heard oral argument on December 10, 2024. The Motions will be resolved as follows.

## I. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Once a motion for summary judgment is properly raised and supported, the opposing party bears the burden of showing that a genuine dispute of material fact exists. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). A material fact is one that might affect the outcome of a party's case. *Id.* at 248; *Hogan v. Beaumont*, 779 F. App'x 164, 166 (4th Cir. 2019). A genuine issue concerning a material fact only arises when the evidence, viewed in the light most favorable to the nonmoving party, is sufficient to allow a reasonable trier of fact to return a verdict in the party's favor. *Anderson*, 477 U.S. at 248. Without more, neither a scintilla of evidence in support of the nonmoving party nor conclusory allegations or denials are sufficient to withstand a summary judgment motion. *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Holland v. Wash.*

2

*Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007) (quoting *Anderson*, 477 U.S. at 249–50) (internal quotations omitted). Nevertheless, in a case arising under ERISA, "where there are disputed issues of material fact, a Rule 52 bench trial . . . is appropriate." *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 961 (4th Cir. 2022). A court must be cognizant not to "'recite[] the familiar rules governing summary-judgment proceedings' but 'not follow them.'" *Id.* (alternation in original) (quoting *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021)).

## II. BACKGROUND

Plaintiff is a former employee of Altria Group, Inc. and participated in the Deferred Profit-Sharing Plan ("DPS") under § 1002(7) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"). (Altria's SUF 1–3, ECF No. 82.) The DPS Plan is sponsored by Altria and is an employee pension benefit plan under § 1002(2) of ERISA. (*Id.*) Fidelity Workplace Services, LLC ("Fidelity") operates the "Benefits Center" of the DPS Plan, which entails processing benefit exchanges requested by participants and other recordkeeping functions. (*Id.* ¶ 3.) Altria and Fidelity contracted to provide "directed and ministerial recordkeeping services" for the DPS Plan as well as for other Altria-sponsored ERISA plans. (*Id.* ¶ 11.) This relationship is memorialized in an Administrative Service Agreement ("ASA"). (*Id.* ¶ 10.)

In October of 2020, Plaintiff, in consultation with financial advisors at Goldman Sachs, decided he wanted to liquidate the funds from his DPS Plan account, which was a 401(k) account, to an investment account with Goldman Sachs. (Pl.'s SUF ¶ 9, ECF No.

92.)  On November 2, 2020, and November 5, 2020, Plaintiff called Fidelity to request a

distribution of his assets in his DPS Plan account to his personal account at Goldman

Sachs.  (*Id.* ¶ 14.)  According to Plaintiff, the timing of these transactions was key.

(*Id.* ¶ 10.)  The phone calls were recorded, and the Court has copies of those recordings.

(*Id.* ¶ 15; Call Tr., Ex. G,  ECF No. 82-7;[1] Audio Files, Exs. C–F, ECF No. 82-3–6.)

On November 2, 2020, Plaintiff spoke with two Fidelity representatives, Tim and

Raleigh; Tim handled Plaintiff's initial requests before connecting Plaintiff with Raleigh

who assisted with the sale of stock.  (Altria's SUF ¶ 17.)  During the phone call, Plaintiff

ultimately told Tim that he wanted to (1) transfer the non-Altria Group stock in-kind; and

(2) sell his Altria Group stock and index fund and rollover the resulting sales proceeds to

a Goldman Sachs account.  (*Id.* ¶ 19.)  Tim explained, however, that he could not

electronically transfer assets directly from the DPS Plan to Plaintiff's Goldman Sachs

account; instead, the only option to directly transfer the assets was for Plaintiff to receive

a physical check in the mail for the value of the cash proceeds along with a statement of

ownership for the stock—an option Plaintiff declined.  (*Id.* ¶¶ 20–21; Call Tr. at 39:1–

17.)  Plaintiff's Goldman Sachs advisor inquired whether there was another way to

receive the assets which avoided mailing a check.  (Altria's SUF ¶ 22; Call Tr. at 38:22–

39:2.)  Tim relayed that there was another option: Plaintiff could open two (2) retail

accounts with Fidelity—a personal IRA (that would receive the sale proceeds) and a

brokerage account (that would receive the in-kind stock)—and transfer his DPS Plan

---

[1] All the phone calls are contained within Exhibit G.  The Court cites to the page and line
numbers reflected within the combined transcript of the phone calls.

assets into those new accounts, and once the assets were in those accounts, Fidelity could

electronically transfer them to Goldman Sachs. (Altria's SUF ¶ 22; Call Tr. at 39:3–14.)

Plaintiff's Goldman Sach's advisor questioned the timing of this method and

whether it would be quicker than mailing a physical check and statement. (Call Tr. at

39:15–17.) Tim explained,

> [O]nce those accounts are open, then we could kind of set this up so that
> we're moving everything in-kind to those accounts. You know, once it's
> processed, it generally just takes a few days as opposed to a check going
> through the mail which can take 7 to 10, so it might even be slightly quicker
> in doing that way, as far as getting it to the retail accounts. However, it's
> then the additional process of – of initiating that transfer of assets from those
> retail accounts.

(*Id.* at 40:5–14.) Plaintiff reiterated to Tim that timing was important and he "want[ed] to

do it the fastest way we can." (*Id.* at 40:15–16.)

Tim responded, however, that "being that you [Plaintiff] have the added step of

needing to do the transfer of assets," the process was "likely going to be roughly the same

amount of time" regardless of which option Plaintiff selected. (Altria's SUF ¶ 23; Call

Tr. at 40:20–41:1.)

Tim further stated that the sale of the Altria stock and index fund shares would

take "a couple of days to settle" and once that settled, Plaintiff could initiate the rollover

into the two Fidelity accounts. (Altria's SUF ¶ 25; Call Tr. 42:4–10.) Tim then walked

Plaintiff through the process of opening his personal IRA and brokerage accounts with

Fidelity. (Call Tr: at 43–54.) During this walkthrough, Tim noted that this process was

"in preparation for when [Plaintiff was] ready to initiate the rollover because today we'll

really just be liquidating the Altria stock." (*Id.* at 53:14–17.) After opening these

5

accounts, Tim told Plaintiff that the real-time traded stock will take two days to settle and once the sales have settled, Plaintiff could then initiate the rollover to the IRA and brokerage accounts within Fidelity—and only after "those funds are moved into those accounts for the NUA," Plaintiff could "initiate a transfer of assets" and "pull it in from the receiving firm [Goldman Sachs]." (*Id.* at 54:13–55:5.) Tim directed Plaintiff to call back that Wednesday, November 4, 2020, after the sale of Altria stock settled and he could then begin the rollover to the IRA and brokerage account. (*Id.* at 57:1–5.) Tim noted, however, that this whole process "generally takes about 10 days" before Plaintiff could reach out to Goldman Sachs to pull his assets to that institution. (*Id.* at 57:6–10.)

Plaintiff questioned whether it could take an additional ten (10) days to complete the transfer. (*Id.* at 57:15–16.) Yet Tim confirmed this timeline: "It can [take that long]. With the NUA, it may be sooner especially with Fidelity being the transfer agent and doing it in-kind within Fidelity it may be sooner, but it can take up to 10 business days." (*Id.* at 57:17–21 (cleaned up).) In response to this timeline, Plaintiff inquired whether he could do the transfer in two (2) steps: first, after the settling period, move the cash proceeds, and subsequently rollover the in-kind stock. (Altria's SUF ¶ 27; Call Tr. at 57:22–58:4.) Tim relayed that doing this sort of "partial rollover" was possible, but it would require sending a check with the proceeds, which Plaintiff again rejected. (Call Tr. at 58:19–59:10.)

After expressing frustration at this timeline, Plaintiff pressed Tim more on how quickly this process would take. (*Id.* ¶ 29.)

Tim: Right. Exactly. So that's where you would just, yeah, we – so we would want to wait *until everything moves into those accounts* with Fidelity before moving it over to . . .

Plaintiff: Right. I – I guess my request to you guys is, I have these accounts set up. When I call back in two days, you ought to be able to move my in-kind quickly into that account. It should not take 10 days . . . .

Tim: You're right. The – the – yeah, the in-kind portion may go much sooner. Yeah. I think it's mainly going to be the stock that you'll be waiting on moving to that brokerage account. So you'll likely see those funds from Altria and the mutual fund.

Plaintiff: It's all going to be – it's all going to be cashed out. Y'all really should make this simple. I mean, that's why I'm . . . [talking over each other]

Tim: Exactly. Right. So the only thing that – that's going to take potentially up to 10 days here, and it likely won't take 10 days would be just the stock that's being moved over. The – – the liquid portion that's being cashed out, *that should just take a day or two*. In which case, once it does hit that rollover IRA, you could certainly reach out to – to have them pull those funds.

Plaintiff: Okay. I just can't believe it takes you 10 days to move a stock from my 401(k) to your own account that we just set up.

Tim: Yeah. It's likely not going to take that just because Fidelity is the transfer agent on the shares of those stocks . . . . So that's where we say it can take up to 10 days for that stock to be moved over because it's coordinating, moving stock in-kind with, you know, potentially various transfer agents. But that should be fine. You – It may take a few days. It won't – and like I said, the – *the liquid portion*, you're right, it would just take a day or two and then once it's available, you can move that out.

(Call Tr. at 58:13–61:11 (emphasis added).)

Plaintiff's call was then transferred to Fidelity representative Raleigh who

executed the sale of Plaintiff's Altria and index fund shares. (Altria's SUF ¶ 30.) While

on the phone with Raleigh, Plaintiff was again told the sale of his stock would take two

(2) days to settle and he should call back on Thursday, November 5, 2020, to initiate the

rollover from his 401(k) to his new Fidelity accounts. (*See* Call Tr. at 77:8–9

("Therefore, the first day you can look into that rollover would be Thursday 5th.").)

Plaintiff followed up on November 5, 2020, and spoke with a Fidelity

representative named Farrow. (Altria's SUF ¶ 32.) Farrow explained that the account

had settled, but the rollover of the cash from the 401(k) to the brokerage account may

take "three to five business days." (Call Tr. at 83:11.) He further told Plaintiff that the

transfer of in-kind stock would "take a bit longer," up to "7 to 10 business days." (*Id.* at

84:8–9.) Nevertheless, Farrow stated, "I think it would be pretty quick since it's Fidelity

internal. Again, I'm going to, honestly, when I quote you this, we'll probably [quote]

you pretty large as far as time frame . . . . [I]t should be, you know, sooner rather than

later." (*Id.* at 84:13–18.) He also noted that the date of the transfer will not begin until

the following day, November 6, 2020. (*Id.* at 84:6–8.) Ultimately, Farrow quoted a

conservative timeline,

> So on the IRA, you know, I'd expect those monies to land that $3,900,000
> give or take. I'd expect those to land between about Monday [November 9]
> and Thursday [November 12] next week, probably closer to Monday than
> Thursday. But again, very conservatively Thursday they'll land. For the
> stock, since we got to quote you 7 to 10 business day[s], again, I doubt it
> takes even near this long, but I'd say worst case scenario is that we're looking
> at – into the growth Fidelity brokerage account by the 20th of November.

(*Id.* at 85:11–20.) Before wrapping up the phone call, Farrow reiterated one final time, "I

should say this transfer's underway. Could be as soon as a couple days, could take a

couple weeks[.] [A]gain. I'm betting, man, I'd say much closer to a couple of days [than

a] couple of weeks, but we'll get that all transferred over." (*Id.* at 91:5–9.)

8

On Monday, November 9, 2020, Plaintiff called Fidelity to begin the transfer from his Fidelity accounts to his Goldman Sachs accounts. After Plaintiff inquired why the rollover was not completed yet and why he did not have access to his money, the Fidelity representative, named Bob, explained that "[t]his is very, very early in the process . . . . [Y]ou made the request on Thursday, 5th. This is the third business day since Thursday, 5th. It usually takes a week and a half to two weeks for the processing to be completed for an NUA transaction." (*Id.* at 97:6–10.) Plaintiff then pressed Bob on why the rollover of his cash and in-kind stock were connected and why Plaintiff could not access his cash earlier to begin investing it. (*Id.* at 97:16–20.) Bob explained that Plaintiff could not access it because it was one account and "all connected at the hip." (*Id.* at 97:21–98:1.) Bob went on to state that

> [F]or real-time traded or share accounted stock which applies to you, the timeframe is 7 to 10 business days due to mandatory stock settlement period. So in your case, [Plaintiff], you called in on the 5th, but for any transaction, any rollover or transaction involving real-time traded stock, the trade date always pushed back one day. So the trade date for selling the stock was actually Friday. And so those positions don't even settle. The stock trades don't even settle until the end of the business today. That's why they quote that 7 to 10 business day timeframe. I can't say that I understand the ins and outs of entirely why all the assets are, you know, tied to the hip but they are, and that's why they quote that 7 to 10 day frame.

(*Id.* at 99:9–100:2.) Frustrated by the timeline and his prior understanding that the rollover of his cash and in-kind were not connected, Plaintiff asked Bob to expedite the transfer and give him access to his cash. (*Id.* at 107:1–7.) Bob responded that Fidelity was actively working on his account, but the process would continue to take time before it would be completed. (*Id.* at 107:15–17.) At the end of this phone call, Plaintiff

9

requested to speak with a manager. That same day, Plaintiff spoke with a Fidelity manager and explained his position. The manager clarified the timeline and reiterated that his rollover was processing, but it was not possible to expedite it. (*Id.* at 132:12–15.) The manager predicted that he would "probably have the funds in the IRA by Thursday or Friday." (*Id.* at 138:12–13.)

The rollover of the cash and in-kind stock into the Fidelity IRA and Fidelity brokerage accounts began on Thursday, November 5, 2020, and was completed a week later, on Thursday, November 12, 2020. (Altria's SUF ¶ 38.) Three (3) business days passed between the initiation and completion of the rollover.[2] (*Id.*) Though Plaintiff had access to his cash assets from November 4, 2020, to November 6, 2020,[3] once he initiated the transfer of the cash assets and in-kind stock to separate Fidelity accounts, Plaintiff was unable to access or transfer the funds until November 12, 2020. (Joint SUF ¶ 11, ECF No. 76.)

According to Plaintiff, the timing of these transactions was strategic. (Pl.'s SUF ¶ 23.) Plaintiff predicted the November 3, 2020 United States Presidential Election between Donald J. Trump and Joseph R. Biden would cause temporary fluctuations in the stock market—of which Plaintiff aimed to take advantage. (*Id.* ¶¶ 23–24.) This was why

---

[2] This is excluding the day the rollover began, November 5, 2020, and the day it was completed, November 12, 2020. Additionally, Wednesday, November 11, 2020, was a federal holiday— Veteran's Day—and November 14–15, 2020, was a weekend.

[3] At this point, the only transaction that had occurred was the sale of Plaintiff's Altria and Index Fund shares. Accordingly, this access was limited to investing in other investment options under the DPS Plan; the assets could not be transferred to Goldman Sachs until they were in the new Fidelity accounts. (Joint SUF ¶ 11.)

Plaintiff sought to quickly transfer his assets to an account with Goldman Sachs, who was advising him throughout this period. (*Id.*) Because the rollover was not completed until November 12, 2020, Plaintiff contends he lost the opportunity to invest his cash assets and receive a return of between $259,931 and $349,625.[4] (*Id.* ¶¶ 29–30.)

About a year after these events, Plaintiff reached out to Altria via email about his concerns with the timing of the distributions. (Altria's SUF ¶ 41.) The Plan Administrator, Tom Watson, reviewed Plaintiff's November 2, 2020 and November 5, 2020 calls with Fidelity and determined that the rollover was completed within the time Fidelity had quoted Plaintiff. (*Id.* ¶ 42.) Plaintiff agreed this email could be treated as his formal claim for benefits, which began the formal claim for benefits process under the DPS Plan. (*Id.* ¶ 45.) Initially, in his claim for benefits, Plaintiff requested only that Altria advocate for him against Fidelity. (*Id.* ¶ 46.) Reviewing Plaintiff's claim, Altria again reviewed the phone calls, determined the rollover was completed within the time frame Plaintiff was quoted, and denied his claim. (*Id.* ¶ 47.) Plaintiff appealed this denial to the Management Committee for Employee Benefits (the "MCEB"). (*Id.* ¶¶ 48–52.) On appeal, Plaintiff had the opportunity to supplement his appeal with any additional materials he believed were necessary. (*Id.* 49.) Throughout his appeal, Plaintiff's principal contentions were that (1) "Fidelity had not told him about the connectivity of the two parts of the transactions (and that the differing time frames were really not different at all, because they were dependent on the completion of the entire

---

[4] Plaintiff submits a report by financial expert Dr. Tim Carpenter, detailing the methodology and findings that led to these numbers. (*See* Carpenter Report, Ex. 6, ECF No. 92-6.)

transaction);" (2) Plaintiff "had not been provided with all of the transcripts of the telephone calls—especially the one on November 9, 2020—between him and Fidelity related to the transaction;" and (3) the transcripts supported Plaintiff's claims that he was misadvised. (Pl.'s SUF ¶ 36; *see* Appeal Letter, Ex. 7, ECF No. 92-7.)

The MCEB met on May 30, 2023, to consider Plaintiff's appeal. (Altria's SUF ¶ 53.) During the meeting, the MCEB received a PowerPoint presentation from Tom Houghtaling regarding Plaintiff's claim and reviewed transcripts of Plaintiff's calls with Fidelity, Plaintiff's emails with the Plan Administrator, Plaintiff's appeal letter and supplements, and other relevant DPS Plan documents. (*Id.* ¶ 52.) The MCEB also listened to the audio of the phone calls on November 2, 2020. (*Id.* ¶ 53.) On June 13, 2023, the MCEB sent Plaintiff a letter informing him of their decision to deny his appeal. (*Id.* ¶ 54; Appeal Denial, Ex. T, ECF No. 82-20.)

Ultimately, the MCEB found that Fidelity completed the rollover in the time frame Fidelity's representative quoted in the November 5 call. (Altria's SUF ¶ 56.) The Appeal Denial acknowledged that a Fidelity representative on November 2, 2020, said the rollover to the IRA "should just take a day or two," but in light of the rest of Plaintiff's conversations, the MCEB did not consider that dispositive, for the following reasons: (1) that representative was speculating about the length of the transaction, and not making a guarantee; (2) Plaintiff was told the longer period of three (3) to five (5) days on November 5, 2020, before he initiated the rollover; (3) the plan documents do not specify any timing for distributions; and (4) three (3) to five (5) days to complete a rollover is a reasonable time period. (*Id.*) It also explained that Plaintiff suffered no

damages because, even under Plaintiff's own account, the soonest Plaintiff would have had access to his funds was Monday, November 9, 2020, and the SPY exchange-traded fund—which Plaintiff relied on to provide his damages—actually *decreased* during that time period. (*Id.* ¶ 58.)

Plaintiff disagreed with the MCEB's decision and initiated this suit under ERISA. (Compl., ECF No. 1.) Plaintiff identifies three (3) erroneous premises relied on by the MCEB. (Pl.'s SUF ¶ 37.) First, it believed that Plaintiff "had full access to his DPS Plan account and was free to re-invest his assets or initiate a distribution" on Thursday, November 5, 2020. (*Id.*; Appeal Denial at 4.) Second, the MCEB did not address Plaintiff's claim that Fidelity failed to explain to him that rollover of the cash assets and in-kind stock were connected, and thus both subject to the longer 7–10 business day timeline. (Pl.'s SUF ¶ 38.) Finally, the MCEB did not review certain documents, including (1) Tom Houghtaling's notes that mention Plaintiff was not told the transactions were linked; (2) a phone call transcript from November 9, 2020; and (3) a phone call transcript from November 10, 2020. (*Id.* ¶¶ 40–42.) In sum, Plaintiff alleges that Altria Defendants abused their discretion in denying Plaintiff's claim for benefits, that Altria Defendants and Fidelity breached their fiduciary duties to Plaintiff, and that Altria failed to provide the Administrative Service Agreement between Altria and Fidelity upon request, in violation of ERISA.

## III. DISCUSSION

### A. Count I—Enforce and Clarify Rights to Benefits under ERISA against Altria Defendants

"Where, as is the case here, the 'ERISA benefit plan vests with the plan administrator the discretionary authority to make eligibility determinations for beneficiaries, a reviewing court evaluates the plan administrator's decision for abuse of discretion.'" *Geiger v. Zurich Am. Ins. Co.*, 72 F.4th 32, 37 (4th Cir. 2023) (quoting *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 629–30 (4th Cir. 2010)). The Court should "not disturb a plan administrator's decision if the decision is reasonable, even if [it] would have come to a contrary conclusion independently." *Id.* (quoting *Williams*, 609 F.3d at 630).

Several factors—referred to as the *Booth* factors—guide the Court's assessment as to the reasonableness of an administrator's decision:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000).

These factors, however, must be considered "in the context of a 'highly deferential' standard of review." *Geiger*, 72 F.4th at 38 (quoting *Cosey v. Prudential Ins.*

14

*Co. of Am.*, 735 F.3d 161, 168 (4th Cir. 2013)); *cf. Conkright v. Frommert*, 559 U.S. 506,

521 (2010) ("Applying a deferential standard of review does not mean that the plan

administrator will prevail on the merits.  It means only that the plan administrator's

interpretation of the plan 'will not be disturbed if reasonable.'" (quoting *Firestone Tire &*

*Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)).  To uphold a plan administrator's

decision, the Court must find the administrator "use[d] a deliberate, principled reasoning

process and [] support[ed] its decision with substantial evidence." *McKoy v. Int'l Paper*

*Co.*, 488 F.3d 221, 223 (4th Cir. 2007).  Here, Plaintiff contends that the MCEB's denial

of Plaintiff's claim for benefits was unreasonable, arguing *Booth* factors (3), (5), (6), and

(8) demonstrate that Altria Defendants abused their discretion.

The Court disagrees with Plaintiff and finds that Altria Defendants did not abuse

their discretion when the MCEB denied Plaintiff's claim for benefits.  Rather, the Court

finds that the MCEB's decision was reasonable and that it "use[d] a deliberate, principled

reasoning process and [] support[ed] its decision with substantial evidence." *McKoy*, 488

F.3d at 223.  The Court addresses each relevant *Booth* factor in turn.

### i.  Factor 3:  The Adequacy of the Materials Considered to Make the Decision and the Degree to Which They Support It

First, Plaintiff challenges the adequacy of the materials Altria considered.  In

addition to several relevant Plan documents and a PowerPoint prepared by Tom

Houghtaling, the MCEB "read the entirety of the transcripts of [Plaintiff's] calls with

Fidelity during November 2020" and "listened to audio recordings of the November 2,

2020, calls." (Denial Letter at 2.)  MCEB member Elena Parrino confirmed this was the

"sum total of materials the MCEB reviewed and considered as part of [Plaintiff's] appeal." (Parrino Dep. at 43:2–5, ECF No. 82-21.) Missing from that list, Plaintiff contends, were some of the transcripts of Plaintiff's phone calls on November 9, 2020, and November 10, 2020, audio files of the November 9 and 10 phone calls, audio files from the phone call on November 5, 2020, and finally, notes from Tom Houghtaling which documented the "connectivity" issue Plaintiff identified. (Pl.'s Mem. in Supp. at 13, 16, ECF No. 92.) Altria Defendants concede these materials were not considered by the MCEB. However, Altria Defendants argue that Plaintiff never requested the MCEB review these materials in his appeal, and they were immaterial to the final decision.

On appeal, Plaintiff asserted that Fidelity misrepresented how long it would take for Plaintiff's transactions to be completed and for him to gain access to his funds. (*See* Appeal Letter) Essential to his claim was the premise that he *would have* acted differently had he been provided with an accurate timeline—that is, he would have left his money in the market. (*Id.* at 5–7; Pl.'s SUF ¶ 30.) By the time Plaintiff called Fidelity on November 9, 2020, his rollovers were already pending and, as the Fidelity representative told Plaintiff on the phone, Fidelity could do nothing to speed up this process. (Call Tr. at 132:12–15.) The MCEB knew that by November 9, 2020, neither Plaintiff nor Fidelity could change the process that was set in motion on November 5, 2020. Accordingly, the MCEB reviewed the representations made to Plaintiff *before* the final decision to commence the rollover was made on November 5, 2020. Although a transcript of the phone calls on November 9, 2020, and November 10, 2020, may have provided more background information, it had no bearing on the MCEB's decision that

16

Fidelity adequately informed Plaintiff of the timeline *before* he initiated the rollover. (*See* Appeal Denial at 6.)

Plaintiff's assertion that the MCEB should have reviewed the audio of these phone calls is equally unavailing.  Throughout his appeal, Plaintiff never suggested to the MCEB that it was through the phone calls' "tone and tenor" that Plaintiff was misled. Instead, Plaintiff focused on Fidelity's explicit statements that the transfer "should just take a day or two."  (Pl.'s Appeal Letter at 4 (quoting Call Tr. at 61:10).)  Moreover, all the statements that Plaintiff claimed to rely on notably occurred during his conversations on November 2, 2020, which the MCEB *did* listen to.[5]  (*See id.*)  Thus, Plaintiff has offered no evidence that shows the MCEB's decision would—or should—have been influenced by listening to the remaining audio files as opposed to relying on the written transcripts.  So too with Tom Houghtaling's notes.

Although the MCEB did not have the benefit of inspecting Houghtaling's notes, it had something better—Houghtaling himself.  During the two (2) hour long meeting, Houghtaling provided a PowerPoint presentation to the MCEB which outlined each of Plaintiff's claims.  (Altria's Resp. in Opp'n at 17, ECF No. 94.)  Throughout this presentation, the MCEB had the opportunity to ask Houghtaling questions, and they did. (Altria Dep. at 32:17–33:5, ECF No. 92-9 ("The committee had numerous questions about the details, the facts of this matter . . . .")

---

[5] The Court notes that it has reviewed the audio as well.

Contrary to Plaintiff's assertions, the record the MCEB reviewed was more than adequate for them to reach a reasoned decision. In addition to all the documents provided by Plaintiff in his appeal, the MCEB reviewed the most important conversations related to Plaintiff's claim for benefits—the phone calls on November 2, 2020, and November 5, 2020. Although other materials may have added supplemental information regarding what stage the transaction was at each day, the MCEB's only task was to decide whether Fidelity *misled* Plaintiff before the transaction began and whether Fidelity completed his transactions within a timely manner. The Court finds the MCEB had adequate evidence to do both.[6]

### ii. Factor 5: Whether the Decision-Making Process was Reasoned and Principled

Second, Plaintiff challenges whether the MCEB's decision-making process was reasoned and principled. He argues the MCEB ignored the fact that the rollover of the in-kind stocks and cash were connected, which something Fidelity failed to mention to Plaintiff until the rollover had already commenced. (Pl.'s Mem. in Supp. at 17.) Furthermore, Plaintiff contends the MCEB erroneously assumed that Plaintiff had access to his money on November 5, 2020. (*Id.*) Ultimately, Plaintiff asserts that "Fidelity materially misled [him] (both by omission and commission) about the time frame for the

---

[6] It is important to remember that the MCEB did review conversations from November 10, 2020, and November 11, 2020. Thus, the MCEB was aware of Fidelity representative Czaplinski's description of how the rollovers were connected. (*See* Appeal Denial at 5 (discussing the conversations on November 10–11, 2020).)

transactions he was about to undertake, and those misrepresentations caused [Plaintiff] harm." (*Id.* at 18.)

On the contrary, the decision of the MCEB was well-founded, Altria Defendants argue, based on the evidence it had. (Altria's Mem. in Supp. at 16, ECF No. 82.) Vital to its decision was Plaintiff's failure to prove he suffered any damages. (*Id.*) In his appeal, Plaintiff emphasized that Fidelity, on November 2, 2020, reassured Plaintiff that the rollover into the IRA "would just take a day or two" before he could move it into his Goldman Sachs account. (*Id.*; Call Tr. at 61:10–11.) But based on this timeline, the earliest Plaintiff could have accessed his assets was November 9, 2020, and the SPY Index Fund, which Plaintiff used to calculate his damages, decreased between the SPY open on November 9, 2020, and its close on November 12, 2020—when Plaintiff had access to his funds.[7] (Appeal Denial at 6–7 (noting on November 9, 2020, the SPY opened at $363.97 and on November 12, 2020, the SPY closed at $353.21).) Thus, even if Plaintiff was misled, his inability to prove he suffered a loss was a substantial factor in the MCEB's decision. (*See* Appeal Denial at 6–7.)

---

[7] Even if Fidelity was unclear on November 2, 2020, regarding the timeline, Plaintiff's own theory of the case must concede that the representative was clear that November 9, 2020, was the absolute earliest Plaintiff could have access to his funds. This is because of a couple steps the representative warned Plaintiff about.

First, the sale of the Altria stock had to settle, which would take two (2) days. (Call Tr. at 77:3–4.) Accordingly, the "first day [Plaintiff could] look into that rollover would be Thursday," November 5, 2020. (Call Tr. at 77:8–9.) Then, accepting Plaintiff's view of the conversation, it would take only "a day or two" for the cash to reach the rollover IRA, at which point Plaintiff could initiate the transfer. (Call Tr. at 61:10.) However, Plaintiff was told by Fidelity that the rollover would not actually begin until the following day. But even assuming the rollover began on Thursday, the rollover would not have been completed until at least the end of the day on Friday. This would provide Plaintiff the opportunity to invest his money at the open of the Stock Market on November 9, 2020, at the earliest.

Another significant factor the MCEB properly weighed, Altria Defendants argue, was that any inaccurate predictions of the timeline by the Fidelity representative on November 2, 2020, were cured by Fidelity's clear and accurate predictions on November 5, 2020. Altria Defendants contrast Fidelity's statements with similar erroneous statements made in *Rego v. Westvaco Corp.*, 319 F.3d 140 (4th Cir. 2003). (*See* Altria's Mem. in Supp. at 17.) In *Rego*, the plaintiff received conflicting timelines for when he could withdraw stocks from his ERISA plan. 319 F.3d at 147. Although the two communications conflicted, the plaintiff had received a letter containing the accurate withdrawal timeline. Both the district court and the Fourth Circuit held that the plan administrator did not abuse its discretion when it relied on this curative letter in denying the plaintiff's request for the difference in the stock's valuation. Altria Defendants contend that similarly, Plaintiff "cannot maintain a claim based solely on his characterization of a single conversation or by disregarding contradictory evidence that he was told." (Altria's Mem. in Supp. at 17.)

The Court notes at the outset, that even before this Court, Plaintiff fails to provide evidence showing he suffered any damages. Plaintiff produced Dr. Carpenter's Economic Loss Report as evidence of his damages, yet the Carpenter Report relies on a plethora of oddities that make the Report inadmissible in evidence, and therefore unable to be relied upon. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); (Altria's Resp. in Opp'n at 13). First, Dr. Carpenter admits he lacked the requisite information to make an informed decision. He did not review "the complete

call transcripts" and thus was confined to speculate as to Fidelity's reasons for requiring

Plaintiff to open personal Fidelity accounts—something the Fidelity representative

clearly explained during the first phone call on November 2, 2020. (Carpenter Report at

1–2.) Dr. Carpenter also erroneously calculated scenarios where Plaintiff had access to

his funds in a Goldman Sachs account on November 2, 2020, or November 5, 2020,

which was never going to be the case under any of the time frames quoted to Plaintiff

during the phone calls. (*Id.* at 2–3.) Dr. Carpenter further speculates why Fidelity

required Plaintiff to liquidate his Altria shares, which is peculiar considering Fidelity

never required Plaintiff to sell his shares—that was Plaintiff's own decision. (*Id.* at 3.)

Because Dr. Carpenter did not rely on sufficient facts or data in forming his opinion—

since he did not view the transcripts—his Report is entirely speculative and fails to meet

the standard for admissibility. *See* Fed. R. Evid. 702 (requiring that "the testimony is

based on sufficient facts or data" and "the product of reliable principles and methods").

Thus, the Court is similarly persuaded that Plaintiff cannot show he suffered any harm by

Fidelity's purported delay. This lack of substantiated damage was rightly a strong factor

in the MCEB's decision. (Appeal Denial at 6–7.)

  To further understand the MCEB's decision, it is helpful to turn to its analysis in

the Appeal Denial. In its letter, the MCEB acknowledged that "the initial Fidelity

representative stated on November 2, 2020, that the rollover would take only a day or two

following the settlement period for the sale of Altria stock." (*Id.* at 6.) This estimate,

however, was speculative, and the MCEB noted that Plaintiff recognized that these were

only speculative estimates. (*Id.* (citing Call Tr. at 127)) During his phone call with a

Fidelity manager on November 10, 2020, Plaintiff stated that on the earlier phone calls he pushed back on these estimates:

> And throughout this, I would make the comment because there were some caveats offered by your professionals, when they were saying, look, this could take this long, all right? I said, but why would it? We've done all this prep work. Well, it probably won't take that long, but it could, and we're obligated to say that. No one ever told me two weeks, all right?

(Call Tr. 127:11–18.) The MCEB also noted that on November 5, 2020, when Plaintiff actually initiated the rollover, he was properly informed that he could "expect those [monies] to land between about Monday [November 9] and Thursday [November 12] next week, probably closer to Monday than Thursday. But again, very conservatively Thursday they'll land." (*Id.* at 85:11–20.) For the stock, Fidelity quoted an even longer time frame—seven (7) to ten (10) business days, or by November 20, 2020. (*Id.*) Although Fidelity did not mention that the cash and in-kind stock were connected, which Plaintiff alleges prevented him from accessing his funds earlier, the entire rollover was completed on Thursday, November 12, 2020, within the time frame quoted for the rollover of the cash and well before the time frame quoted for the rollover of the in-kind stock. This led the MCEB to find that when Plaintiff initiated the rollover on November 5, 2020, he was properly informed of the time frame—notwithstanding Fidelity's earlier representations on November 2, 2020—and the rollover was completed within the reasonable time frame quoted on November 5, 2020. The Court concludes that this was a reasonable conclusion based on Fidelity's statements on both November 2, 2020, and November 5, 2020.

Finally, Plaintiff's argument that the MCEB erroneously believed that Plaintiff had access to his cash funds for investing as of November 5, 2020, is misplaced. The MCEB noted that on November 5, 2020, Plaintiff "was free to re-invest his assets or initiate a distribution." (Appeal Denial at 4.) This was true. "From November 4, 2020, to November 6, 2020, Plaintiff had access to" his cash from the sale of his Altria stock "for the *limited purposes of investing in other investment options under the Plan.*" (Joint SUF ¶ 11 (emphasis added).) Irrespective of any ambiguities in the time frame to complete the transactions, Fidelity consistently told Plaintiff how he could liquidate his Altria stock and ultimately transfer all his assets to an account with Goldman Sachs. (*See* Call Tr. at 53:14–55:5.) These steps illustrate what access Plaintiff was warned he would have at each stage.

First, pursuant to Plaintiff's request, his Altria stock would be liquidated; this would take two (2) days to settle. Then, after the monies settled, Plaintiff could call and initiate the rollover to the IRA and brokerage accounts within Fidelity; this would take an additional couple days.[8] After the assets were in the two (2) accounts, Plaintiff could initiate a transfer of assets and pull the assets into a Goldman Sachs account. Yet despite Fidelity's explanation of these steps *before* Plaintiff initiated the transactions, Plaintiff's arguments here reflect a misunderstanding of what occurred between November 2, 2020, and November 5, 2020. When Plaintiff called on November 5, 2020, the only event that

---

[8] For Plaintiff, this transfer would be initiated on November 5, 2020, and start the following day, on Friday, November 6, 2020. (*See* Call Tr. at 77:8–9 ("Therefore, the first day you can look into that rollover would be Thursday 5th."); *see also* Call Tr. at 85:6–8 ("First day today is really just us preparing to transfer, and that's going to put us at a trade date of tomorrow.").)

had occurred was the liquidation of Plaintiff's Altria stock and Index Fund shares. (Joint SUF ¶¶ 3, 5.) All of his assets remained in the DPS Plan. Accordingly, he was free to reinvest those monies within the DPS Plan or initiate a rollover or distribution, as he did here. The issue was that Plaintiff wanted to reinvest those monies in an external Goldman Sachs account, not the DPS Plan. Plaintiff knew that he needed to send his assets into two (2) Fidelity accounts before Goldman Sachs could pull his assets over, which is why he called on November 5, 2020—per Fidelity's instructions on November 2, 2020—to initiate a rollover into Fidelity IRA and brokerage accounts.

In other words, on November 5, 2020, Plaintiff had access to his money, just not the access he wanted. And nowhere in the MCEB's Appeal Denial did it purport that Plaintiff "could simply have taken his money out of the DPS Plan at that time and put it into a Goldman Sachs account like he had wanted"—quite the contrary. (Pl.'s Mem. in Supp. at 17.) The MCEB noted that "if [Plaintiff] was dissatisfied with the timelines provided by Fidelity, he had the opportunity to re-invest his assets and hold off on the rollover and in-kind distribution until after the markets had settled." (Appeal Denial at 5.) Instead, Plaintiff proceeded with the rollover.[9] Therefore, considering the MCEB's decision and the record before it, the Court finds that the MCEB's decision-making process was reasoned and principled.

---

[9] Plaintiff appears to argue that he did not understand what the MCEB or Fidelity mean when they use "distribution." (Pl.'s Reply at 13, ECF No. 101.) When the MCEB stated Plaintiff was free to "initiate a distribution," this meant he was free to send his in-kind stock and cash into the IRA and brokerage accounts—not into a Goldman Sachs account. Plaintiff recognized this very fact on the phone with Fidelity on November 10, 2020: "It was communicated I wanted to get my funds to Goldman as quickly as possible. So the quickest way to do it, was to do it as two distributions, that's how it should have been done." (Call Tr. at 163:18–21.)

### iii. Factor 6:  Whether the Decision Was Consistent with the Procedural and Substantive Requirements of ERISA

Third, Plaintiff challenges whether Altria's decision was consistent with the procedural and substantive requirements of ERISA.  He identifies two (2) procedural irregularities.  First, Altria failed to provide a "full and fair review" of Plaintiff's claim when it failed to obtain the transcript of the call on November 9, 2020.  (Pl.'s Mem. in Supp. at 18.)  Second, Charlie Whitaker was involved in both Altria's initial "informal" review of his claim *and* the final review by the MCEB, of which Whitaker was a member.  (*Id.* at 18–19.)  Plaintiff cites to 29 C.F.R. § 2560.503(h)(3)(v) to show how this dual participation was irregular and inconsistent with ERISA.

ERISA regulations state that a claims procedure will *not* provide a full and fair review if the claims procedure fails to, *inter alia*, "provide for a review that takes into account all comments, document, records, and other information *submitted by the claimant*, regarding the claim . . . ." 29 C.F.R. § 2560.503(h)(2)(iv) (emphasis added). Here, Plaintiff did not submit the transcript of the call on November 9, 2020, and thus he cannot claim that it was inconsistent with ERISA for the MCEB to not review it.[10] Additionally, Plaintiff's cite to 29 C.F.R. § 2560.503(h)(3)(v) also fails to show irregularities in Altria's process because subsection (h)(3)(v) pertains to *group health plans*.  Nothing in this case suggests any reason to graft group health plan related

---

[10] But again, the Court notes that the phone call was also immaterial to the issue of whether Plaintiff was misled before he initiated the rollover.

procedures into the matters here. Accordingly, the Court fails to see how Altria's

procedures were inconsistent with the procedural or substantive requirements of ERISA.

### iv. Factor 8: The Fiduciary's Motives and Any Conflict of Interest It May Have

Fourth, and finally, Plaintiff challenges Altria's and the MCEB's purported

conflicts with Plaintiff. (Pl.'s Mem. in Supp. at 19.) First, Plaintiff submits that because

Altria functioned as both the reviewer and payor of the claim, it was forced to place its

own financial interest above Plaintiff's interest. Yet Plaintiff does not identify how this

is a conflict of interest. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834

(2003), which Plaintiff cites, simply supports the argument that the MCEB could not

*arbitrarily* refuse to credit Plaintiff's evidence. But this assertion of arbitrary decision

making is easily dispelled because, as this Court has already mentioned, there was ample

reason for the MCEB to legitimately reject Plaintiff's claim. Moreover, *Black & Decker*

does not stand for the proposition that it is improper for an administrator to hear an

appeal even though it will be the one paying out the claim if the appeal succeeds.[11] In

fact, the Supreme Court noted in passing that Black & Decker "both funds the Plan and

acts as plan administrator." *Id.* at 826. The Supreme Court found no reason to consider

such a relationship improper and neither does this Court.

In another alleged conflict of interest, Plaintiff argues that Charlie Whitaker's

participation in the appeal process was inappropriate because of previous involvement

---

[11] Altria notes that this is not even an accurate factual description of the situation because Fidelity would have indemnified Altria for Fidelity's error, if one was found. (Altria's Resp. in Opp'n at 21.)

with the claim. His principal evidence is an email where Whitaker suggests the Appeal Denial should "come from [another MCEB member] since I've had previous interactions with [Plaintiff]." (Whitaker Email, Ex. 12, ECF No. 92-12.) This remark is far from a smoking gun and the Court struggles to infer any material conflict of interest here. Even if Plaintiff could substantiate the conflict, it amounts to one (1) of eight (8) factors—none of which are necessarily dispositive by itself.

### v. Conclusion

The Court has considered all the relevant *Booth* factors and finds that Altria Defendants and the MCEB "use[d] a deliberate, principled reasoning process and [] support[ed] its decision with substantial evidence." *McKoy*, 488 F.3d at 223. The decision of the MCEB was wholly reasonable in light of the facts and Plaintiff's arguments, both before the MCEB and before this Court. The Court has discussed in detail each factor that Plaintiff argued supported his position and found that each factor favors upholding the administrator's decision, not overturning it. Accordingly, the Court will grant summary judgment as to Count I in favor of Altria Defendants.

### B. Count III—Breach of Fiduciary Duty Under ERISA Against Altria, DPS, and Fidelity

Plaintiff contends that Fidelity, Altria, and the DPS Plan breached their fiduciary duties to Plaintiff by misleading him about the connectivity between the transactions at issue and by failing to tell him about how the time frames for both transactions were connected. He argues Fidelity's advice to Plaintiff about how to set up his proposed withdrawal transactions—including (1) its failure to make clear to Kelly that the

transactions were connected, (2) that the time frames for the transactions were dependent upon each other, and (3) that he would lose access to his funds during the entirety of the two-part transaction—constitutes a fiduciary function and therefore fiduciary breach, under the relevant ERISA precedents. (Pl.'s Mem. in Supp. at 19 (citing *Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996) (explaining that "[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation" is a fiduciary activity).) Plaintiff also asserts that Fidelity was not sufficiently clear that the transactions would be controlled by Fidelity's timeline, rather than Plaintiff's desired timeline, and Fidelity was under an obligation to make Plaintiff aware of this while he was deciding how to best liquidate his DPS Plan funds in an expedited fashion. (Pl.'s Mem. in Supp. at 20.) Plaintiff notes that a plan fiduciary "was required to speak up 'when it knew [its] silence might be harmful." *Dawson-Murdock v. National Counseling Group, Inc.*, 931 F.3d 269, 279 (4th Cir. 2019) (quoting *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir. 2001)). And because Fidelity failed to "speak up" and notify Plaintiff regarding the timing of the transactions—despite knowing timing was key—it breached its fiduciary duty. (Pl.'s Mem. in Supp. at 21–22.)

On the contrary, Defendants contend that Fidelity is not a fiduciary and did not act as one. (Fidelity's Mem. in Supp. at 14–15, ECF No. 88.) "A fiduciary is anyone who exercises discretionary control or authority over the policy's management, administration, or assets." *Canada Life Assur. Co. v. Estate of Lebowitz*, 185 F.3d 231, 236 (4th Cir. 1999) (internal citations omitted). Here, neither the DPS Plan Document

nor the Administrative Services Agreement identify Fidelity as a fiduciary. Rather, the
ASA explicitly states that Fidelity is not a fiduciary and that Fidelity has no discretionary
authority or responsibility with the DPS Plan. (Altria's Mem. in Supp. at 19; ASA
§ 2(A).) Even if Fidelity acted outside of the scope of the agreement, Defendants
contend that Fidelity never "exercised discretionary control or authority" over Plaintiff's
assets. (Altria's Mem. in Supp. at 19–20.) The transcripts of the phone calls reveal,
Defendants argue, that Fidelity simply informed Plaintiff of the different options he had
available to move his funds: "*e.g.*, a partial versus complete distribution; distribution via
mail or into new Fidelity accounts; or a distribution of assets in-kind or in cash." (*Id.* at
20.) And merely informing Plaintiff of how long those options could take did not give
rise to a fiduciary relationship. (*Id.* (citing *Robertson v. Pfizer Retirement Committee*, 20
Civ. 672, 2021 WL 3077553, at *1 n.2 (S.D.N.Y. July 20, 2021) ("[T]he calculation or
estimation of benefits is ministerial and does not give rise to ERISA fiduciary status.").)
Moreover, Defendants argue Fidelity provided accurate information to Plaintiff as to his
options and timing, and Fidelity completed the requests within the stated time frame.
(Fidelity's Mem. in Supp. at 13–14.) Plaintiff was told on November 5, 2020, that it
could take three (3) to five (5) days for the cash to transfer into his Fidelity IRA account,
and it did. (*Id.*) Finally, Plaintiff's complaint that he was not told the two (2) rollovers
were connected is immaterial because there was no delay as a result of the connection—
both transactions settled on the same day. (*Id.*)

     "ERISA contemplates two general types of fiduciaries:" named fiduciaries and
functional fiduciaries. *Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d 269,

275 (4th Cir. 2019).  Plaintiff argues that Fidelity qualified as a "functional fiduciary."

ERISA defines such a fiduciary and provides that

> a person is a fiduciary with respect to a plan *to the extent* (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any *authority* or *control* respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (emphasis added)).  Here, Plaintiff points to Fidelity's role in

"exercis[ing] any authority or control respecting management or disposition of assets."

(Pl.'s Resp. in Opp'n to Altria Mot. at 11, ECF No. 97.)  Since Fidelity exercised control

and authority over Plaintiff's assets throughout the transactions in question, Plaintiff

reasons that Fidelity acted as a fiduciary.  Yet this argument is unavailing.

"[T]he inclusion of the phrase 'to the extent' in § 1002(21)(A) means that a party

is a fiduciary only as to the activities which bring the person within the definition . . . . In

other words, a court must ask whether a person is a fiduciary with respect to *the*

*particular activity at issue*." *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th

Cir. 1992) (emphasis added).  Plaintiff alleges that Fidelity breached its fiduciary duty by

ultimately failing to communicate what process would be best for Plaintiff, what access

Plaintiff would have during the process, and how long the process would take.  (Pl.'s

Mem. in Supp. at 19–22.)  It is evident that Fidelity was not acting in any fiduciary

capacity when it advised Plaintiff what mechanisms were available to send his assets

from the DPS Plan to a Goldman Sachs account; instead, Fidelity was merely performing

routine ministerial functions, which do not entail any fiduciary status. *See Dawson-Murdock*, 931 F.3d at 276 ("In sum, the 1975 bulletin explains that a plan administrator is a functional fiduciary with respect to plan administration, but a person or entity that is not a plan administrator and performs only ministerial functions in relation to a plan is not a functional fiduciary."); *Adams v. Brink's Co.*, 261 F. App'x 583, 592 (4th Cir. 2008) ("Ministerial administrative acts are not fiduciary acts.").

Plaintiff counters that "conveying information about plan benefits to a beneficiary in order to assist plan-related decisions can constitute fiduciary activity." (Pl.'s Resp. in Opp'n to Altria Mot. at 13 (citing *Dawson-Murdock*, 931 F.3d at 280).) Yet the issue in *Dawson-Murdock* was whether a person acted as a fiduciary when she advised the plaintiff not to appeal the plan administrator's denial of her benefits claim. *Dawson-Murdock*, 931 F.3d at 280. The supporting cases the Fourth Circuit cited strike a similar theme—that a person is a fiduciary when they provide, or fail to provide, information about plan benefits that "permit[ ] beneficiaries to make an informed choice about continued participation." *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 379 (4th Cir. 2001) (quoting *Varity Corp.*, 516 U.S. at 502). Here, Plaintiff decided he wanted to transfer all his assets to an account with Goldman Sachs and sell his Altria and index fund shares along the way. Fidelity explained the different options Plaintiff had to effectuate this transaction: (1) a partial or complete distribution; (2) by mail or separate Fidelity accounts; and (3) a distribution of assets in-kind or in cash. Plaintiff had already decided to discontinue his participation in the DPS Plan and Fidelity merely provided

31

Plaintiff with the ministerial information he needed to effectuate his decision. Thus, Fidelity did not act in a fiduciary capacity.

Even if Fidelity acted as a fiduciary, the Court does not believe it breached any purported duty. As the Court has already discussed, Plaintiff was provided with several somewhat varying time frames throughout his conversations with Fidelity and somewhat varying estimates for when the transactions would be completed. Yet consistent throughout each call was the emphasis that none of these transactions would occur overnight. On November 2, 2020, Plaintiff was quoted a general time frame of ten (10) days. (*See* Call Tr. at 57:6-10.) The Fidelity representative's estimate that the cash assets would be available sooner still included the caveat that it would take a "day or two," *after* the sale of the stock settled. Thus, Fidelity did not "create[] the false impression to [Plaintiff] that he could obtain his cash funds as soon as they settled." (Pl.'s Mem. in Supp. at 20.) Moreover, on November 5, 2020, when Plaintiff actually initiated the rollovers, the Fidelity representative could not have been clearer that Plaintiff might receive access to his cash assets as late as Thursday, November 12, 2020. (Call Tr. at 85:11–20.) Fidelity completed the rollovers within the quoted time frame and within a reasonable amount of time—that is, within four (4) business days.

Additionally, although the connection between the rollover of the cash and in-kind stock was not clearly articulated on November 2, 2020, Plaintiff was put on notice that initiating a complete rollover might take longer than a partial rollover of only cash. On November 2, 2020, the Fidelity representative stated that it "generally takes about 10 days" for *everything* to be moved into the Fidelity IRA and brokerage accounts before

Plaintiff can pull the assets over to Goldman Sachs. (*Id.* at 57:6–8.) After hearing this, Plaintiff expressed shock that it might take ten (10) days. In response, Plaintiff was told the way to avoid the delay on the in-kind stock was to execute a partial rollover; yet this required Fidelity to send a physical check. (Call Tr. at 58:19–59:5.) Since Plaintiff did not want to receive a check, he was told that he "would want to wait until *everything* moves into those accounts with Fidelity before moving it over." (Call Tr. at 59:13–16.) Although the Court recognizes that it was not clearly articulated that the transactions were "tied to the hip" until later, Plaintiff had some reason to believe that he might need to wait until everything was in the new Fidelity accounts. However, as the Court discussed earlier, Plaintiff fails to show that—even if the failure to clearly articulate the connectivity issue amounted to a fiduciary breach—he suffered any harm due to the connectivity of the two (2) transactions.

Accordingly, the Court finds that Fidelity did not act as fiduciary, and even if its conduct elevated its status to that of a fiduciary, Plaintiff has failed to show there was a material breach of this duty. For these reasons, Plaintiff's claims against Altria, Fidelity, and the DPS Plan fail, and the Court will grant summary judgment in their favor.

### C. Count IV—Claim Against Altria for Statutory Penalties Under ERISA

29 U.S.C. § 1024(b)(4) of ERISA provides that:

[t]he administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

Failing to provide such documents entitles Plaintiff to statutory damages of $110 per day. *See* 29 U.S.C. § 1132(c)(1)(B); 29 C.F.R. § 2575.502c-1 (increasing the amount from $100 to $110).

Plaintiff asserts that the Administrative Service Agreement ("ASA") between Altria and Fidelity is a document to which Plaintiff is entitled under § 1024(b)(4)— namely, as an instrument under which the DPS Plan is "operated" or "established." Plaintiff requested a copy of the ASA, but Altria denied his request, stating that the ASA "is not a document that governs participant benefits, and therefore is not an instrument under which the Plan is established or operated." (Appeal Denial at 7; *see* Appeal Letter at 10.) Courts have a range of views on whether ASAs fall within § 1024(b)(4). *See Mondry v. American Family Mut. Ins. Co.*, 557 F.3d 781, 796 (7th Cir. 2009) (holding that the administrative services agreement was an "other instrument under which the plan is established or operated"); *Michael v. American Intern. Group, Inc.*, 2008 WL 4279582 (E.D. Mo. Sept. 15, 2008) (same); *but see Hively v. BBA Aviation Ben. Plan*, 331 F. App'x 510, 511 (9th Cir. 2009) (holding that the administrative services agreement did not relate to the manner in which the plan is operated). Plaintiff identifies the Tenth Circuit's recent opinion in *M.S. v. Premera Blue Cross*, 118 F.4th 1248 (10th Cir. 2024), to be instructive here.

In *Premera*, the Tenth Circuit held that the ASA at issue in that case was a contract "under which the plan is established or operated." *Id.* at 1267. There, "[t]he ASA creates the system requiring Plan beneficiaries to submit benefits claims to Premera (rather than Microsoft directly), thus 'establish[ing]' the Plan for beneficiaries . . . . And

34

the Plan 'operate[s]' according to the terms of Premera's administration, as delegated by Microsoft to Premera in the ASA." *Id.* Here, Plaintiff argues the DPS Plan Document expressly identifies the ASA as a document through which Fidelity, as the DPS Plan's "Third-Party Recordkeeper," "provide[s] ministerial recordkeeping and administrative functions under the Plan." (Pl.'s Mem. in Supp. at 24.) And such designation makes it a contract "under which the plan is established or operated."

Altria contends that Plaintiff misreads the case. (Altria's Resp. in Opp'n at 20–21.) In *Premera*, Microsoft effectively delegated its plan administration responsibilities to Premera and permitted Premera to function beyond that of a simple recordkeeper. Indeed, although Microsoft was named the Plan's administrator, Premera was designated as the Plan's claims administrator and reviewed both the initial claim for benefits and the appeal thereafter. *Id.* at 1255. Here, the ASA does not make Fidelity the plan administrator or delegate other fiduciary functions to Fidelity. To the contrary, the agreement gives Fidelity a limited and nondiscretionary role, which is to "provide[] ministerial recordkeeping and administrative functions." (DPS Plan at 31.) Fidelity does not handle claims by beneficiaries, nor does it exercise any discretion. Fidelity merely acts pursuant to the direction of plan participants. Accordingly, Altria asserts that *Premera* is not on point and the ASA should not fall under § 1024(b)(4).

The ASA is undoubtedly an agreement, contract, or other instrument. *See Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 653 (4th Cir. 1996). The principal question, then, is whether it is something by which the plan is "established, [] operated" or managed. *See id.* (noting the plain meaning "encompasses [a] formal or legal

document[] under which a plan is set up or managed."); *but see Hively*, 331 F. App'x at 511 ("Documents which 'relate only to the manner in which the plan is operated' are not subject to disclosure under § 1024(b)(4)." (quoting *Shaver v. Operating Eng'rs Local 428 Pension Trust Fund*, 332 F.3d 1198, 1202 (9th Cir. 2003)).

To address this question, the Court examines what relationship the ASA governs. *See Askew v. R.L. Reppert, Inc.*, Case No. 11-cv-04003, 2016 WL 447060, at *11 (E.D. Pa. Feb. 5, 2016) ("[C]ourts have refused to find that third-party services agreements fall within the ambit of Section 1024(b)(4) if they only govern the relationship between the third-party and plan and "not the relationship between the plan participants and the provider."' (quoting *Hively*, 331 F. App'x at 510)). Administrative services agreements that outsource all, or some, of the plan administrator's duties are often held to be contracts that fall within § 1024(b)(4). *See Kollman v. Hewitt Assocs., LLC*, 2005 WL 2746659, at *2 (E.D. Pa. Oct. 18, 2005) ("R & H outsourced to Hewitt virtually all of the administrative services for, *inter alia*, the Plan, including the R & H Pension Plan."); *see also Premera*, 118 F.4th at 1267 (outsourcing the entire claims process to Premera). But agreements that "merely memorialize[] the obligations" between an administrator and a third-party are often not held to be within § 1024(b)(4). *See Askew*, 2016 WL 447060, at *11 (quoting *Loc. 56, United Food & Com. Workers Union v. Campbell Soup Co.*, 898 F. Supp. 1118, 1127 (D.N.J. 1995)).

The ASA describes Fidelity's roles and responsibilities with regard to the DPS Plan; namely, Fidelity has no discretionary responsibilities and simply facilitates transactions. (*See* ASA § 2(A) ("Nothing in this Agreement is intended to give Fidelity

36

any discretionary authority or any discretionary responsibility for the Plans, and the

relationship of Fidelity to the Plans is intended to be that of a directed recordkeeper with

respect to the DB, DC, and H&W Services.").) Additionally, the ASA notes that any

participation with claims for benefits and appeals is limited to providing information to

litigate those claims:

> Fidelity will manage participant problems or complaints with respect to the
> Services and shall provide participants with information on the proper
> procedures for filing a Claim with ALCS in accordance with the Directions.
> Fidelity shall provide ALCS, or its designee(s), with the necessary
> information for ALCS, or its designee(s), to respond to such Claims, as
> described in the Plan Administration Manual.

(ASA § 7.) Fidelity has no role in the actual adjudication of claims. (*See* ASA § 7

("The parties agree that Fidelity shall have no responsibility for any ALCS

participant claims and/or appeals under ERISA Section 503 ("Claims") in

providing the Services.").)

References to the ASA and Fidelity in the DPS Plan Document are also

important to consider. The DPS Plan Document directly references and

incorporates the ASA:

> Third-Party Recordkeeper means Fidelity Employer Services Company (or
> any successor thereto), retained to provide ministerial recordkeeping and
> administrative functions under the Plan as documented in a separate
> Administrative Services Agreement dated July 1, 2002, as the same may be
> amended from time to time.

(DPS Plan § 1.100, ECF No 82-1.) The DPS Plan Document is rife with mentions

of Fidelity and its responsibilities and authority under the Plan. (*See, e.g.*, DPS

Plan § 1.05 ("The Administrator has assigned certain duties to the Third-Party

Recordkeeper [Fidelity] and the Participating Companies."); *id.* § 1.22 ("Company

Account means the Account maintained by the Third-Party Recordkeeper . . .");

*id.* § 1.82 ("A Real-Time Trade shall be performed in accordance with such rules

as may be prescribed from time to time by the Trustee of Part D, Part I, Part K,

and Part O of the Fund *or Third-Party Recordkeeper.*" (emphasis added)); *id.*

§ 8.01(b)(4) ("The Trustees shall be subject to the directions of . . . the

Administrator or its delegates (*including* the Third-Party Recordkeeper) . . ."

(emphasis added)).

Although the DPS Plan Document incorporates the ASA, the ASA does not

provide information that would assist a participant in understanding "where he

stands with respect to the plan—what benefits he may be entitled to, what

circumstances may preclude him from obtaining benefits, what procedures he

must follow to obtain benefits, and who are the persons to whom the management

and investment of his plan funds have been entrusted." *Hughes Salaried Retirees*

*Action Comm. v. Adm'r of Hughes Non-Bargaining Ret. Plan*, 72 F.3d 686, 690

(9th Cir. 1995). Other documents alert participants of Fidelity's processes and

procedures relevant to them. (*See* Understanding Real-Time Trading, Ex. 3, ECF

No. 92-3 (explaining Fidelity's procedures for executing the purchase and sale of

stock).)

Plaintiff argues that one way the ASA informs Plaintiff of his rights is its

discussion of Fidelity's role in the claim and appeal process. (Pl.'s Resp. in Opp'n

to Altria Mot. at 17.) Yet the ASA only states that "Fidelity will manage

participant problems or complaints with respect to the Services and shall provide participants with information on the proper procedures for filing a Claim with [Altria] in accordance with the Directions." (ASA § 7.) Section 13.05 of the DPS Plan Document, however, provides the specific processes and procedures established to adjudicate a claim for benefits. There is no reason to believe that had Plaintiff "been in possession of the ASA from the start, he could have properly requested claim documents or other claim information from Fidelity as part of bringing his claim for benefits to" Altria. (Pl.'s Resp. in Opp'n to Altria Mot. at 17.) This is because Section 7 of the ASA states that Fidelity shall provide "[Altria], or its designee(s), with the necessary information . . . to respond to such Claims . . . ." But Plaintiff is neither Altria nor its designee so it is unclear that Plaintiff could even "start the [claims] process by asking for information from Fidelity." (*Id.* at 17.) Moreover, Section 7 actually cuts *against* Plaintiff's position because it emphasizes Fidelity's responsibility to provide Altria with information, not a participant—reinforcing the argument that the ASA only regulates Altria and Fidelity's relationship.

Although the ASA is a contract, the Court does not believe that it is a contract "under which the plan is established or operated." *See* § 1024(b)(4). This is because the ASA regulates the relationship between Altria and Fidelity—*not* the relationship between Plaintiff and Altria—and simply memorializes Fidelity's obligations to provide certain services to Altria. *See Askew*, 2016 WL 447060, at *11. Although the services Fidelity provides are for the benefit of Plaintiff—a

39

plan participant—this alone is insufficient to pull the agreement into the ambit of

§ 1024(b)(4). Accordingly, Altria was under no obligation to provide the ASA to

Plaintiff upon his request. Therefore, the Court will grant Altria's motion for

summary judgment.

## IV. CONCLUSION

For the foregoing reasons, Altria Defendants' Motion for Summary Judgment

(ECF No. 81) and Fidelity's Motion for Summary Judgment (ECF No. 87) will be

granted. Plaintiff's Motion for Summary Judgment (ECF No. 91) will be denied.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: March 26, 2025
Richmond, Virginia

40